case number 4190038 in re Etate of Struever. For the appellant, we have Mr. Unsell. Is that correct? Yes. Okay. And for the affiliate, Mr. Fanning. You may proceed, Mr. Unsell. May it please the court, Edward Unsell on behalf of the Appellant Mary Ann Heron Counsel. I must confess that this subject matter is a little bit out of my ballywick. I'm in my 41st year of practicing law. This is the first estate case, probably my 31st appellate argument, very first one that I've ever had to argue. So if I stumble a little bit, please. In this particular case, it's hard for me to get started. So I'm just going to start at the very first and state the findings of this court, the critical findings of this trial case. The court ruled that the plaintiff complaint failed as there was no credible evidence that was presented on the allegations that was made towards the fraudulent transfer and the undue influence counts. The court specifically found in its order that that did not happen. The court also specifically found that Pete Shuman, at the time he executed the will and the revocation of POA at Bob Creeper's office with Attorney Fleming was common. And the court specifically found that there was no basis for an award of punitive damages. So with those findings, then the court, in my opinion, was mandated to allow the motion for directive verdict that we filed at the end of the plaintiff's case and to allow for the summary judgment. No question. As just a very brief set of facts, Pete and Alice Shuman executed mutual trust in 2002. Alice died approximately four years later. But one is sufficient to note that in her joint trust, my client, Mary Ann Herron, was a co-trustee with each of them. So this isn't a situation where some young floozy came out of the woodwork and ended up with an older fellow. And the only reason I say that is that if you take a look at the complaint that plaintiff has filed, they mention five different times in there per age. They call her young, they said the 38-year-old won. So the implication is that you have a younger woman with an older fellow. And there's absolutely no testimony in it as to that. But I just want to point out that in 2002, she was friends not only with Mr. Shuman, but obviously very good friends with Alice. And also, I'm sorry, I need to back up. Sure. In your initial remarks, did you say that the court did not find undue influence? No. Okay, I just wanted to make sure. No, the court found undue influence. Okay. The court found that at the time of the execution of the will that Pete Shuman was conned. And the only reason I bring that up, because there are jurisdictions that find that the competency of the testator at that time would undo an undue influence claim. Illinois is not that. We are not that jurisdiction. I understand that, and that's correct. So at the time they executed the original trust agreements, there was two adult children. And these two adult children were Hannah and Nathan Struber. And they were stepchildren to Pete. They actually were not Alice's natural children. She had adopted them. So they had the trust. They went along. About 24 years later, Alice unfortunately dies. And Alice, I believe, was about 15 years, 14 years younger than Pete. That did upset him. But at that time, Mary Ann became his confidante, his caretaker, whatever you want to call her. I mean, she had a lot to do with him. She was a POA at the time. And there's no question that she had a close relationship with him. Did the close relationship get to the point of a fiduciary relationship? I mean, the court found that it did. And so I'm not going to argue with any of this judge's findings as to these facts. Because I think that the findings are fact. When you apply the law to them, clearly, clearly, we should have won. The drafted verdict should have been allowed. But then in October of 2007, that's the date that we must focus on. On that date, Pete Shuman walks into Ivan Tarika's office, who I suppose is the middle point between Camden County, where he lives, and St. Clair County, where Mr. Fleming's office apparently is. He walks in there and not only talks to one lawyer, Mr. Fleming, he talks to two. He has a conversation with Tarika. His deposition was taken. And there's no question that Mary Ann Herron was not there. There's no evidence at all to point that she drove in there. And my position, the court decision did so. She was not in there. His interactions with Mr. Fleming was completely alone to the point to where he directed Mr. Fleming on who the new power of attorney was. And so that's critical. He rejected his prior powers of attorney and health care and POA of Mary Ann Herron. Once he did that, then he executed the will and the trustee deed to transfer her the property. Mr. Fanning, in his pleadings, stated that he was forced to go there, that Fleming was a part of this conspiracy and that there was these secret influences. That is why I read to you what the court ruled. The court ruled that none of these were proven. Therefore, there's nothing else to decide. Because the law is clear. The allegations for undue influence must be specifically claimed. They were not claimed. We were not advised of anything. Now, I want to point to the court, to the Kelsey case that is cited in their brief. And I want just, and I know my people are reading cases by file, but here's the point that I want to make. This is why we have the decision that we have. In a will contest, where the will seems to have made an unequal division of property, there's a disposition in the mind of the average juror to hold such will in balance and to look for excuses to do so. In spite of the law, the testator can make such a disposition of this property as he sees fit and he can bestow his bounty on whoever he wants. That is the critical rule that we have here. Pete Shuman could do what he wanted to do. He could give it to seven aboriginal pygmies if he wanted. And the only thing that we have to look at is, are they standing there with a blow dart to his head? He can do this. Now, this is what I believe happened. If you look at what the court stated, the court states in its order, I find no believable scenario as to why he would give his property to Marianne Heron and not to the stepchildren. He was incredulous that Pete would cut these stepchildren out. This is in the bondage order. It was clear that Pete loved Alice very much. The court said Pete wanted his property to go to someone in the Titus family. He says that Pete leaves nothing for the children of the woman that he loves. He says he left nothing to the Titus family. Then the court says, he didn't leave anything to any church. And in the backdrop of that, in hearing on the motion to reconsider, this is what the court said. I think she got greedy. I think that this could have been done in a way to where it has been much more difficult for me, the court, to make the findings that the court made. If everything didn't end up with her. Counsel, isn't the key thing in this case that the court found that your client had a fiduciary relationship with a decedent? That's not the key thing, Your Honor. Well, just by way of explanation, that changes all the rules, doesn't it? I mean, if there's a fiduciary relationship, there's a presumption of an impropriety if the person with the fiduciary relationship benefits from this will. You find? Well, there's the presumption of undue influence. When you say impropriety, are you suggesting undue influence? Yes. OK. So you're this court. And this is back in 1996. So I believe that, Justice Beckman, you were here. You found that more than a mere existence of a fiduciary relationship must be shown to raise that presumption of impropriety, as you characterized it, as an undue influence. The rebuttal presumption arises if, number one, a fiduciary relationship existed between the testator and the beneficiary. OK. If that existed. So here. Well, the court found it to be. OK. The court did find it. The court, I believe, was inappropriate to find it. But let's say that that's true. OK. Then they must find that the testator was dependent upon the beneficiary. OK. We'll give you that. Then the testator reposes trust and confidence in the beneficiary. And I'm quoting from Zachary versus Mills. But then there's a fourth element. And that's what brings us to the will is written by or its preparation procured by the beneficiary. And the fact that Pete Shuman, of sound mind and body, met in private with a duly licensed attorney, when which the court found that the attorney had no dog in that fight and the attorney was specifically not part of any conspiracy that's in the bill, that destroys the fourth element of the judicial system. So what about the trial court's finding that your client contacted Fleming's office and faxed documents to it pertaining to the will and trust? OK. But the documents itself were the old will. The Old Testament, there is no evidence that she directed any type of language in the will, that she insinuated that she did anything to procure it. All she did was use her office fax machine to fax what was already done to him. There was no directions. If there would have been directions given to the attorney or suggestions, believe me, that would have been made exhibit A plus and that would have been in the trial. All she did was provide information. That's not procurement. And the undue influence, as you so found in Zachary versus Mills, must have been directly connected with the making of the will, since the gravamen of the undue influence is that the intent of the test taker is replaced by the intent of the one observing the influence. So, counsel, it's your position that the fact that your client faxed documents to this attorney, who actually had been for many years the attorney for your client's father, that there was no evidence of any communication between Uncle Pete, as they called him, and the attorney who completed this new will and trust document, that there was no communication between them other than him showing up in the office. And then this message your client left with the office saying, Decedent is ready to go. When can you come to Jerseyville or Alton? And then beyond that, we also have the testimony of your Sheila and members of the Titus family and talked about that she overheard a conversation between Gene and your client about getting the deceased to the office before he changed his mind. I mean, all of that is not sufficient for the court to determine that, for the court to find that your client had involvement in the procurement of the will. Well, let's forget that. Oh, I've thought about this a lot. I know, but let me think about this. First of all, there was an objection as to Holly DeShirlia testifying that this is a person who is deceased, the father is deceased, so supposedly he made these statements. Well, he's not a party to this, he's not a defendant. This is just her father making some sort of statement. You can't impute standing from him to her. How could she even testify to that? That's covered in our brief. But let's say that he did. So what? What did he say? He's ready to go. That was a message that your client left. Yeah, oh. Well, I thought you were talking about what Holly said. Well, she informs the lawyer that he's ready to execute a will. If there was anything in those messages that says, I want you to do this, or to do it this way, or to put that there is no direction, you have more of an involvement with the defendant and the attorney in the Zachary versus Mills case. No, it's not. It doesn't rise to the level of procurement. And it's not. Why isn't this a matter for the trial court, as trier of that, having heard and seen everything, to draw the court's conclusions on inferences from all of this? Why isn't that tied to a deference by us? We didn't hear and see these people. No, you didn't. But you're bound by what was pled. There was nothing pled that even remotely involved Gene Heron, her father, or anybody. But what was pled was that he was forced to attend this lawyer's meeting, which that was never shown, and that this lawyer was in on a conspiracy. None of that was ever shown. In fact, the court specifically ruled that out. And then the court went on its own to come up with this theory and this ruling contrary to these facts. Well, didn't the court pretty much dispel any notion that it relied on any conspiracy theory when it heard the motion to reconsider? I mean, he just went through detailed analysis of, this is why I did this, this is why I did that, this is how I viewed this. He seemed to really dispel that. He did do that, but it's one thing to take out of a case and say, look, I looked at the facts and I looked at the credibility of the witnesses and I did this and I did that. Okay, so what I'm telling you three is fine. Look at the facts. Look at the facts and the light most favorable that you want. It falls so short. There is no way you can get around that this man was there by himself with an attorney. Unless you bring the attorney in. My light's on. That means you have a little more time. It's the red light. I want to talk about the attorney's case real quick. Okay, so the court also awarded the attorney's case. If you take a look inside of Elias, if you take a look at Elias, apply Elias, there is no argument. He had to have found punitive damage to award attorney's fees against this executrix is what she was. Now, what I find incredible, we didn't have this case. My law firm did not have this case. This case was brought by some other law firm and we got in the middle of it and I didn't do it. I mean, I'm not passing any blame. But what's incredible to me is we've never filed. We never filed a petition for attorney's fees, which we could have had against the estate. I don't even know how we got paid off when we did it. But we could because we represented the executor. Now, in this instance, the only way that, and if you look at the Elias court, there's two methods on which to apply it. There's punitive damages and there's equitable contribution. There is no case that allows equitable contribution on the part of the litigant unless it was the executor. So you would have to make the law more important. The petition for attorney's fees filed in this case was never admitted in the evidence. Counsel referred to it in court. It's in the record. I believe it's rule 1221, 1222. It's on that record. Counsel will go to it. He does. He never provided it to us for the record. He stated it in the court, I have a petition for attorney's fees and we'll do it at the close of the evidence. Never entered the affidavits. Well, in looking at Elias, I agree with you. You're talking about punitive damages or equitable contribution. And when we're dealing with equitable contribution, it appears that we're dealing with where the statute specifically authorizes attorney's fees, like for an executor or something like that. And we don't have that here. We don't have any statutory authorization for that. I mean, I was surprised neither counsel mentioned the American rule, which is discussed in Elias, in that generally you pay your own fees. You pay your own attorney's fees. That's correct. I mean, I just think that's a given and I apologize for that. It is on the first day of law school, but I still was surprised that no one mentioned it. Okay. My other wife's on that. That means done for now anyway. You will get additional time on rebuttal if you desire. Mr. Fanning. Thank you, Your Honor. I'm here to please court counsel Ed Fanning on behalf of the Kelly-Gross appellate. In dealing with the person who replied to the defendant's case and situation here, the issue of undue, to invalidate a will, although there are multiple reasons in which an individual can seek the invalidity of a will, such as lack of testamentary capacity, fraud, revocation by the testator, ignorance of its contents, and such as that. Now, whether or not the court found that Mr. Schuman did not have a lack of capacity or undue influence, fraud, and the rest of the other bases, one of those theories, if it's found not to be in existence, doesn't mean that the court could not find that one of the other ones existed, like it did here as far as undue influence. So if the court does find undue influence, it just as well invalidates it as well as the court would have determined that Mr. Schuman was incapacitated. So the fact that he did not rule that Mr. Schuman was incapacitated or unable to execute the will does not mean that he can't then still find that undue influence existed such that would invalidate the instrument. Now, the court never found that the defendant, the court even went on, the court said in its ruling that it established that a fiduciary relationship existed and asked us to shift the burden over to her. The court said she didn't even present enough evidence to shift that burden back. But even with that, the court went on with its analysis and even intricately analyzed all of the facts and all of the evidence because when you do that, when you take the presumption of undue influence, say of maybe a fraudulent transaction, and the reason why that's important is because we do have multiple transactions. We have the signing over of the family farm on October 2007. We also have the creation of a new trust as well as the execution of the will, a new will that makes solely the defendant the sole beneficiary of all those things. But undue influence and considering these transactions and the presumption there intricately intertwines. So the court is looking at them with the totality of the situation here. Now, when you look at undue influence too, once you establish all the elements there, is there a fiduciary relationship, is there procurement, and is the individual's undue influence such that it supplants their own will over that of the testator here? Now, the fiduciary relationship is established on a multi-level of situations here. Soon after Allison dies, we have health care POA, which the defendant becomes the primary power of attorney over his health care. We have property power of attorney executed within months. We have the transfer of the trust funds over to a new brokerage house that she then becomes the POA to handle the stock transactions inconsistent with the terms of the trust. Again, we have the durable power of attorney. We have her all of these things in and of itself establishes a fiduciary relationship independently. We also have her even in the counsel's argument when he first presented. This was an individual who Mr. Schuman had confidence and trusted. So we're just showing that he has a dependency. One of her documents that she presents, she says she charges him 15 minutes a day to look over his stock portfolio, which the court found to be incredible. But, again, she's handling stock transactions, taking his money. Now, once that fiduciary relationship, because an individual can build those types of relationships, they are caught the ability to abuse that position. So what we do in those cases, we shift that point over again. But they have to show by clearly convincing evidence that they did not do these things, and it's not necessarily on them. Now, it's a rebuttal presumption, but the evidence has to be strong. And even then, say she did have evidence, and the court found that there was no credible evidence to substantiate the basis of that. And when we did that, even if she would have been able to rebut that, the court then would still look at all the evidence and still consider that. The court didn't even get to that. Now, given the length of the court's orders and decision and its in-depth analysis of all the witness testimony, of all of the evidence, the evidence actually becomes overwhelming against the defendant here. Now, they say there's no concurrence. Sure. The problem is that in these situations, we don't have a device yet, maybe in the future. We can take it and hook it up to somebody's brain, and they can tell us exactly what happened and the truth of the matter. The problem is we have to get the evidence elsewhere. We have to look at the circumstantial evidence that defines what the relationship is, how are they handling this case. And unfortunately, we can't get the whole picture. I can't necessarily get the color of the sky exactly at this section, but I've got the whole picture here enough that we can see what happened here. We have the only evidence of procurement is the evidence of procurement by the defendant. She's sending faxes as early as May, when she's already having the relationship, she has a pre-shared relationship with him. There's a delay. What's interesting, too, is that when she has an inquiry by one of the stepchildren, who does she go to? She goes back to his old estate attorney, and then gets her to send out a letter explaining what the children's rights are to be quiet, it's his, and we'll notify him in the future. And you notice that she has communication with the attorney. She's driving the show. She's communicating with the attorney. Now, everything is represented as Mr. Schuman, but nobody ever tells his attorney. It's odd that he doesn't go back to his own trusted estate attorney, whom him and his wife have spent their whole life or their whole life's number of years in drafting their estate plans. Now, the transfer of the deeds and the transfer of the new trust, since they are estate documents, they come under the same purview of the will because they are a disposition of the estate assets. Now, then, again, fortunately we were able to find communications with all the messages. There were no messages by Mr. Schuman. The attorney says, I don't ever recall talking to Mr. Schuman. I know I never met with him before that day. Now, look at the voluminous amount of documents. As an attorney who practices in estates and real estate documents, there are a lot of consequences from the way these documents pertain to a disposition of certain assets that have to be explained and gone through. This attorney said he's had 30 to 40 times over a complex trust, changing who his major beneficiaries are, a will, a transfer of his entire farm, only preserving a life estate. A farm that's 120 acres with his residence. He can't change his mind after that. She's the owner of it, subject to his life estate. The consequences of that, that it's not revocable, you can't change your mind on that, these are things that have to be intricately gone over. Or was this a situation that he just brought the individual in and explained, sign here, sign here, sign here. The other interesting fact was nobody even verified that he was who he was. There was no driver's license presented by Mr. Schuman. But you're not contesting that it was him. No, we don't have any evidence to substantiate that his signature wasn't his signature. Now, I'm not an expert, but everybody said it appeared to be relative, and that wasn't the main issue there. What's important is to show that they're how involved. Are they making sure he doesn't have time to give in to us? They're not even checking his ID. Are they following the proper procedures? Is this really what you want to do? They say, well, he made sure that Rona was his POA, Rona Thomas. The documents were already drafted. Those decisions were made before Mr. Schuman showed up on that day. He showed up to a different law firm with the documents already prepared. It's not clear he conveyed that information at that time. Who prepared the documents? The documents were prepared by Attorney Fleming's office. And based upon what information they received? We don't have. The only communications that we have to what there is no evidence of exact details of who conveyed that information. The only evidence that we believe came from the defendants, based upon her receiving the only communications of the various drafting of the documents, as well as her communications in, she's the only one communicating with Mr. Schuman. Please call me. I'm sorry, Mr. Fleming, the Attorney Fleming. She's the one saying. She's even arranging the meeting for him to show up. When can you come here? When can you come closer to Jerseyville? When can you come to the Alton area? So they compromised to go to the Wood River area. Did anyone from Mr. Fleming's office testify as to the source of the new arrangements of the will? No. I don't recall. I don't recall. They did not confirm that it came from the defendants, but they also did not confirm that the information came from Mr. Schuman. They did confirm receiving the faxes from the defendant with respect to the prior trust and will and all of those documents, correct? Correct. And they confirmed that the defendant set up the appointment. Correct. And then the other evidence that, you know, one of the things that Mr. Fleming was an important factor, and I think they tried to argue in a counter-brief, was that after the situation here, after the documents were drafted, Mr. Fleming said, the trust isn't funded. I said, it's not funded? No, it's just a blank trust. It's up to the decedent, or if she wasn't deceased at the time, it's up to the grantor to go out and fund it, put it in. Now, who puts it in there? Not him. The communications to the bank come from who? The defendant to try to transfer the check and the account from one trust to another. We've noticed from the bank statements they never change until her communication. Then what happens is we don't even have an exhibit A drafted for almost a year. Now, who tells? Who is that communication coming from? Again, there is a list. It's not the decedent. It's not his handwriting. It's not his signature saying, hey, take this and give this to my attorney and put this in there. It's, again, the decedent. How does this look? Even asking the attorney questions. Should I put all of these things in here? Should I include these things? Even then, the trust fund from the General Shuman Trust from 2001 isn't even changed over until after Mr. Shuman has passed away. And then in October of 2013, they receive a fax from one of the associates or friends of the defendant. Hey, transfer this over. Again, now, they say, well, that goes to show that's no. It is also. It goes to show what? I'm sorry. That we're trying to argue that the procurement did not occur until after the October of 2007 conveyance of the process. No, it just shows further evidence that she's been in the driving seat from day one. And also, I think it does make a factor, if it's not been funded, as far as the issue of the trust, you can't then retroactively fund it after his death. Because, again, according to attorney's funding, he's the only one that can fund an amount. Now, just so I don't run totally out of time. Now, where the court didn't make, we believe, made errors. Once the court found that there was a fiduciary relationship, that there was procurement, that the court did find all the elements necessary to establish funding influence, it shifted that burden over to the defendant and even looked at all the others going through. The evidence was presented that there was $10,070.87 that was taken by the defendant in cash from monies of Mr. Schuman. That these monies, never was there ever an accounting provider, what she did with the money out was for his benefit or that he gave it to her as a gift and such. And if you look at a lot of those, her name is on the check with Mr. Schuman a lot of times. So he signs it and she signs it. A lot of those checks, she takes half. Is she taking half that she believes she's an owner? But, again, it's her burden to prove what she did with those monies. Because she's the fiduciary. She's the one acting as co-trustee. She's the one acting as this power of attorney. And absent that evidence, the court has to award that money back to the plaintiffs. In this case, back to the estate. Now, she testified that she would give those funds to him and he would use it to make payments or things that he wanted to pay in cash. And as Justice Steinman indicated earlier, I mean, the judge heard the witnesses, saw the witnesses. Apparently, the judge found that to be credible. Do you disagree with that? I mean, not do you disagree that it's credible, but do you disagree that that's what the court found? Initially, it didn't. Initially, it was ruling out that the court addressed that issue. It wasn't until the motion to reconsider that it was brought to his attention. And I don't know that it went that far in the motion to reconsider. And that's why I wanted to give the opportunity to address that. But, again, that evidence has got to be clear and convincing. In his first ruling, what was his testimony? I find nothing in Mr. Britton's testimony to be credible. Nothing. So then now, because I missed this one, yeah, maybe that was credible. But, again, in the overall case, and that's what I think the court wants. Because, remember, his ruling says she didn't shift the burden on that. She didn't shift the burden on any of these things. They found that it was. Now, addressing the attorney's students, in these situations here, one of the things that we believe where the court erred in its analysis of whether or not to and those of its punitive damages here, I wouldn't stress punitive damages, where the court erred on the issuance of punitive damages, and it is within the sound discretion of the courts of whether or not punitive damages are appropriate. The problem is here. The court imposed a condition on whether or not punitive damages should be awarded, which was there was no physical harm being placed on the individual. And since there was no physical harm by Mr. Schuman, I'm not going to give punitive damages. And that's where our argument as far as punitive damages is, that's not a requirement. Is that a fair characterization of the trial court's position in ruling on that? It seems to me the trial court considered the fact that Mr. Schuman was well taken care of, that he didn't have any physical harm to him, that basically she took care of everything for him and, for the most part, did a good job as far as taking care of him. I don't necessarily agree that the court took the position that you had to find that there was physical harm. Well, but he said that there was neglect, or she had not done those things, that he suffered from certain things that, because she did take care of him and make sure that he was fed and such, and that's how he explained the way or a basis to do it. Or I don't know if he did not address the issue of, well, because the attorney's fees, I'm going to award attorney's fees, and that might be so burdensome, I hate to add further more to it. He doesn't really clarify that aspect of it. Now, that may have weighed into him saying, hey, I'm already making her pay this amount of money. But do you agree that without the punitive damages, you can't have an attorney's fees award? I don't necessarily agree with that. What would be the statutory or the case law support for that in the absence of punitive damages, dealing with a non-executor? Well, I've said it in cases- That involve executors, right? Right. But it's not that there was two, the way I read it, is there was two cases that had broad discretion in the allocation of those attorneys. You're talking about the Elias case where it talks about the two reasons? That's correct, and also- But Elias itself did involve an executor, right? It did do. And where there was statutory authority for the imposition of attorney's fees. That is correct. That's the difficulty as far as I can see. Is the decision whether to impose punitive damages on the trial court left to its discretion? It is left to the court's discretion. And so- It has to be. And we are- First of all- I know that's a tall hurdle that I'm asking the court to do that. The only problem I have is if his analysis imputes an additional condition that's not a requirement, and if the court doesn't take that that was an actual requirement, then he said, because I found no physical harm to it. And that was what I- My problem with the punitive damages is by adding that- I believe they did add that additional situation there. Also, I don't think that he considered the issue of punitive damages impacted- I think he looked at the attorney's fees almost as an aspect of punitive in nature because of the amount that he had worked with. Thank you, counsel. You are out of time. Thank you. Mr. Ansel, any rebuttal? Okay. Who else was to take care of Ethan the seven years that he lived after his wife died? Who else? Was it these stepchildren? Ones that never came to count on him? Even at the funeral of her own mother, she says, well, I was on a plane, but I got a text message. I didn't see any plane tickets, and so that's why I didn't show up for her funeral. There is ample reason why Pete did what he did. He talked about him selling the farm to the Tituses. Well, the Tituses wanted something from him. But the talks that he had with them was a month before he went to Parika's office. Never was there any discussion afterwards. It was six years, seven years? Seven years he lived with this will and this transfer. The court has got to think about that. And, I mean, if it was going to change it, he changed it. She would have had to keep him in a box or something. He had the right to give that to her. Maybe he did it because she worked for him. But the fact that he shows up at this attorney's office by himself, alone, flimming, he says he didn't flim him. He testified. I may have talked to him once on the phone. And for them to say that these are complex trusts? You're saying that flimming says he talked with the seated... He said I may have talked to him once on the phone. This testimony is in the record. And I'm sorry I didn't try this case. That was my understanding. I may have talked with him once. But I didn't meet him. This is the first time I've met him. But I may have talked to him once on the phone. But generally the way this happens is my office does and I go do this. This is not a complex trust. He's given this to her. There already was a trust. To say that he had 128... They had to talk to him about every single acre. So, counsel, let's get to where maybe you can be helpful to the court. And that is each argument the gentleman proposed to the court has merit, is supported by the facts. But where is the there there? What is it that can tip the scales in favor of overruling this court's decision? The court heard the evidence and made credibility findings and made the findings that it made. Well, first of all, they were never, these facts were never brought. The court did it upon his own. The court, as I pointed out before, made all those statements based upon the disposition of the property. He says, I could have done this if everything didn't end up with her. So it was an affront to this court's own sensibilities as to how this gentleman should have given his property. So you understand that to be, that was the thing that put the court over the edge? Or is the court saying and explaining the totality of the circumstances, all of these points rises to the level that supports the court's finding? But the only point is that she got everything. The court went on to say, well, I think Titus should have gotten something. And I think the church should have gotten something. And I think the woman that he loved, these stepchildren should have gotten something, even though they never came around. They never had anything to do with him. I said, I mean, undue influence is that you are doing something that you wouldn't have done. That this person is controlling your mind. The only person to control anything is, I'm sorry, but it's this trial judge. He controlled because it interferes with his sensibilities as to what this testator intended to do. And the fact that he did it and never said nothing for seven years or six years. He died in 2013. He lived there for six years. He left it sit there. This was his intent, and you should go with what this man was regardless if it was not a stepchild. That's ridiculous. The court should have ruled for us on the drafted verdict and should have ruled for us on the summary judgment. It just, there's no facts that show that. And what he did afterwards and what he did before, if you take a look at the case, please take a look at the Franciscan Sisters of the Supreme Court case, verse 18. It explains very well what Justice Stedman brought up about the presumptions. That once you introduce any evidence, then it's done. Then it's done. Then it's solved. Their law failed to prove by preponderance that it existed. And they didn't prove it. They didn't prove it based on the allegations of their complaint. And they didn't prove it on this far-fetched civil conspiracy theory of the trial. Thank you. Thank you, counsel. We'll take this matter under advisement and be in recess.